IN THE COURT OF CRIMINAL APPEALS


OF TEXAS







AP-74,223






ROBERT BURNS SPRINGSTEEN, IV, Appellant



v.



THE STATE OF TEXAS






Appeal of Case 99-6015 of the 167th


Judicial District Court of Travis County






 Womack, J., delivered the opinion of the Court, in which Price, Johnson,
Holcomb, and Cochran, JJ., joined. Keller, P.J., filed a dissenting opinion, in
which Keasler and Hervey, JJ., joined. Meyers, J., dissented.



 The district court convicted the appellant of capital murder and sentenced him to death. A
statute requires appeal to this court. (1)

 The appellant questions the sufficiency of the evidence of his guilt; in Part I of this
opinion, we hold that the evidence of guilt was legally sufficient. In Part II, we consider the
appellant's complaints about the admission of hearsay evidence. In light of a significant decision
about the constitutional standards for such evidence, which the Supreme Court of the United
States delivered after the trial, we hold that the judgment must be reversed. In Part III, we
consider some other issues that might recur in a retrial.

I.


Sufficiency of the Evidence


 The appellant complains that the evidence was insufficient, both as a matter of law and as
a matter of fact, to prove his guilt beyond a reasonable doubt. He does not contest the sufficiency
of the evidence to prove that, on or about December 6, 1991, Amy Ayers was intentionally killed
with a firearm in the course of burglary and robbery. His arguments are that "there is no physical
evidence supporting the State's theory that appellant and [three other suspects] committed these
crimes," there is "DNA and fingerprint evidence suggesting other perpetrators," and his and
another suspect's confessions "are facially inconsistent with the crime scene and each other." (2)

A. Legal sufficiency


 If the evidence in a criminal prosecution was not sufficient, as a matter of law, to prove a
defendant's guilt, the Double Jeopardy and Due Process Clauses of the United States Constitution do not permit the courts of a state to retry a criminal case after the reversal of a conviction on
appeal. (3) Therefore, even when it has found reversible error in the trial, an appellate court must
consider a complaint that the evidence was legally insufficient. (4)

 In deciding whether evidence was legally sufficient to sustain a conviction, the relevant
question is whether, after viewing the evidence in the light most favorable to the prosecution, any
rational trier of fact could have found the essential elements of the crime beyond a reasonable
doubt. (5)

 The essential elements in this case are set out in the charge of the court, which required
the jury to decide whether the evidence proved beyond a reasonable doubt that, on or about
December 6, 1991, the appellant intentionally caused the death of Amy Ayers by shooting her
with a firearm or strangling her with a ligature, while in the course of committing or attempting
to commit robbery or burglary. We find sufficient evidence in the appellant's confession and the
physical evidence.

 Firefighters found the bodies of four teenaged girls while they were extinguishing a fire in
the back room of a frozen-yogurt shop in Austin around midnight on December 6, 1991.

 Three bodies had been piled together in the center of the room, covered with inflammable
materials, and set afire. Each of these three girls had been killed by one shot from a gun that was
in contact with the back of her head. A bullet was recovered from the head of each of these
bodies. One bullet was a .22-caliber, and the other two bullets were too deformed for their
calibers to be determined.

 Amy Ayers's body lay apart from the other three. She had been shot twice. One wound
was made by a .22-caliber bullet that was recovered from the top of her head. This shot hit the
top of the skull and knocked a small plug of bone down on top of the brain. The bullet stopped
there, without going into the brain. In all probability, it did not cause her death. Another shot
entered her head behind her left ear and went through the brain. This wound was instantaneously
fatal. The bullet exited Ayers's right cheek. It was the only exit wound on any of the four girls.

 The only bullet that was found at the scene was a .380-caliber bullet near Ayers's body.
The only shell casing that was found was a .380-caliber in a floor drain. (A water-pipe had been
broken or melted in the room where the bodies were found, and water stood more than an inch
deep on the floor.) Investigators closely guarded the fact that a .380-caliber gun had been used, so
that that information would not be reported to the public.

 The jury heard evidence that a .22-caliber revolver was the only other gun used in the
offense.

 More than seven years later, the appellant told investigators that he was one of four
suspects who took part in the burglary, robbery, and murders at the yogurt shop. His statement
was tape-recorded. He said that he had used a .380-caliber, automatic pistol, and that another
suspect had used a .22-caliber revolver. He admitted that he used the .380-caliber pistol to shoot
a girl behind her left ear. He said that this shot did not kill the girl. He said that he raped the girl
after he shot her. His description of the girl's position when he was assaulting her matched
photographs of Ayers's body as investigators found it. The appellant said that, after he raped the
girl, the suspect with the .22-caliber revolver shot her in the head. The appellant's description of
the offenses matched the physical evidence in other aspects as well.

 As to Ayers, the only material discrepancy between the appellant's statement and the
physical evidence was that the appellant said that the shot that killed the girl was not from his
gun, but rather from the other suspect's .22-caliber revolver. The jury, of course, could have
believed the appellant's admission that he fired a .380-caliber bullet, and they could have found
that that bullet went through Ayers's head and killed her. They could have disbelieved his
statement that the other suspect's .22-caliber bullet killed Ayers, in light of the evidence that such
a bullet did not penetrate her brain.

 Although we shall refer to more evidence in deciding the appellant's other claims, we
need not go further into the details here to hold that, after viewing the evidence in the light most
favorable to the prosecution, any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt.

B. Factual sufficiency


 The question of the factual sufficiency of evidence of guilt is resolved by somewhat
different standards, (6) and the appellate remedy is very different. If we sustained the appellant's
complaint that the evidence was insufficient as a matter of fact, our judgment would be to
remand the case to the trial court for retrial. (7) Since we shall render a judgment of remand because
of error in the admission of evidence, we need not address the complaint that the evidence was
factually insufficient.

II.


Admission of Co-defendant's Statement


 In his first and second points of error, the appellant complains that the trial court erred in
admitting excerpts from Michael Scott's written confession. The points, which correspond with
the appellant's objections at trial, are based respectively on the Confrontation Clause of the Sixth
Amendment to the United States Constitution and the rules of evidence for hearsay.

A. Rules of Evidence for Hearsay


 A rule of evidence makes hearsay inadmissible "except as provided by statute or these
rules" or certain other rules. (8) Another rule of evidence says that twenty-four kinds of hearsay
statements are not excluded by the hearsay rule. (9) The twenty-fourth kind, which this case
involves, is the statement against interest:

 A statement which was at the time of its making so far contrary to the declarant's
pecuniary or proprietary interest, or so far tended to subject the declarant to civil
or criminal liability, or to render invalid a claim by the declarant against another,
or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable
person in declarant's position would not have made the statement unless believing
it to be true. In criminal cases, a statement tending to expose the declarant to
criminal liability is not admissible unless corroborating circumstances clearly
indicate the trustworthiness of the statement. (10)

B. Confrontation Clause


 The admission of hearsay against a criminal defendant, even if permitted by the law of
evidence, also implicates the Confrontation Clause of the Sixth Amendment. (11) The clause reads,
"In all criminal prosecutions, the accused shall enjoy the right  to be confronted with the
witnesses against him." It applies to criminal prosecutions in the courts of Texas. (12)

 For about twenty-five years, the Supreme Court had held that the Confrontation Clause
did not bar admission of an unavailable witness's statement against a criminal defendant if the
statement bore "adequate indicia of reliability." (13) To meet that test, evidence must either fall
within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." (14)

 In 2004 the Supreme Court departed markedly from its previous tests. It said:

 First, the principal evil at which the Confrontation Clause was directed
was the civil-law mode of criminal procedure, and particularly its use of ex parte
examinations as evidence against the accused.  The Sixth Amendment must be
interpreted with this focus in mind.

  Leaving the regulation of out-of-court statements to the law of evidence
would render the Confrontation Clause powerless to prevent even the most
flagrant inquisitorial practices. 

 This focus also suggests that not all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears
little resemblance to the civil-law abuses the Confrontation Clause targeted. On
the other hand, ex parte examinations might sometimes be admissible under
modern hearsay rules, but the Framers certainly would not have condoned them.

 The text of the Confrontation Clause reflects this focus. It applies to
"witnesses" against the accused -- in other words, those who "bear testimony."
"Testimony," in turn, is typically "[a] solemn declaration or affirmation made for
the purpose of establishing or proving some fact." An accuser who makes a
formal statement to government officers bears testimony in a sense that a person
who makes a casual remark to an acquaintance does not. The constitutional text,
like the history underlying the common-law right of confrontation, thus reflects an
especially acute concern with a specific type of out-of-court statement.

 Various formulations of this core class of "testimonial" statements exist
. Regardless of the precise articulation, some statements qualify under any
definition -- for example, ex parte testimony at a preliminary hearing.

 Statements taken by police officers in the course of interrogations are also
testimonial under even a narrow standard. (15)


 The Court reversed a state court's judgment of conviction for assault which rested in part
on a hearsay statement that the defendant's wife, who did not testify because of a privilege, had
given to police investigators. (16)

C. Michael Scott's Written Statement


1. Admissibility


 In September 1999, Michael Scott met six times with police detectives and a Texas
Ranger who were investigating the murders. The meetings included interviews at the detectives'
office, an interview at Scott's home, interviews in automobiles, and trips to the scene of the
crime and to places where Scott thought the detectives might find evidence. Scott made more
than one tape-recorded statement in which he admitted taking part in the burglary, robbery, and
murders at the frozen-yogurt shop. He also signed a written statement.

 The statement may well have been admissible under the exception in Rule of Evidence
803(24) for hearsay statements that subject a person to criminal liability and the trustworthiness
of which are clearly indicated by corroborating circumstances. That issue is moot because it is
clear that, under the analysis for the Confrontation Clause that the Supreme Court was to adopt in
2004, the trial court's ruling in 2001 was erroneous. Scott's statement was exactly the kind of
testimonial statement that the Court held to be prohibited by the Clause: "Statements taken by
police officers in the course of interrogations." (17)

2. Harm


 The remaining question is the harmfulness of the error. If the appellate record in a
criminal case reveals constitutional error that is subject to harmless-error review, the appellate
court must reverse a judgment of conviction unless the court determines beyond a reasonable
doubt that the error did not contribute to the conviction or punishment. (18) A Confrontation Clause
violation is subjected to such a review. (19) 

 Of such determinations, the Supreme Court has said, in words that are as applicable to
this case as they were to the one in which the Court wrote them, "Our judgment must be based on
our own reading of the record and on what seems to us to have been the probable impact of the
[co-defendants' statements that were admitted in violation of the Confrontation Clause] on the
minds of an average jury." (20)

 We have set out in Part I, above, some facts of the offense. Next we consider the
erroneously admitted statement itself. The trial court "redacted" Scott's written statement in an
effort to remove its references to the appellant and the other suspects. The court admitted the
edited statement, which was read to the jury in this form:

 Voluntary statement. At 10:39 o'clock a.m. on the 14th day of September,
1999, and before making the following statement, I, Michael James Scott, while at
the Austin Police Department, was warned by Detective Manuel Fuentes, to
whom this statement is given, of my rights as follows. [Warnings and waiver
omitted.]

 My name is Michael James Scott. I am 25 years old. I was born on 2-6 of
1974. I am currently at the Austin Police Department homicide office at the Twin
Towers giving this statement to Detective Manuel Fuentes and Texas Ranger Sal
Abreo.

 I am giving this statement about my involvement in the death of four girls
at the yogurt shop on December 6, 1991.

 I had previously given accounts of what happened in 1991 and afterwards
to Detective Fuentes, Detective Ranger Sal Abreo, Detective Merrill, Detective
Ron Lara and other detectives. Today I told Detective Fuentes and Texas Ranger
Sal Abreo that now that I have confessed to my father and my best friend, Patrick
Davidson, in my part in the the [sic] girls' death. I have been able to remember
and want this statement to be correct and truthful. These things I will clear up in
this statement, such as what I threw off the bridge after the murders. I had previously said that I threw a set of keys off the bridge; it was actually a cutting knife
that I got from inside the yogurt shop.

 And when I told you that I didn't really remember what happened to the
second gun, the small semiautomatic pistol, I do remember that I gave it to my
friend Patrick Davidson in December 1992 so that he could get rid of it. I did not
want to pull him into this, and that is why I have been so hesitant to tell you what
happened to the gun. If something happens to him, he has nothing to fall back on.
I will explain this more in detail later.

 On December 6, 1991, I don't remember exactly what time it was. It was
still daylight. Drove up to the strip mall where the I Can't Believe It's Yogurt
shop was at. Go inside and took a look at the yogurt shop. Got up and made it
look like going to the restroom. Walked out the back and walked around to the
front of the building. Drove back to the mall. Left Northcross Mall. Drove through
the alley behind the stores to see if the back double doors were slightly open. The
building was on the driver's side, the left side of the car.

 I brought the can of Zippo lighter fluid. It was the bigger metal can. Went
into the back door. One of the girls said something like, "Hey, you, what are you
doing? You don't belong in here." This girl was wearing a T-shirt. I believe that it
had the name I Can't Believe It's Yogurt on it. Believe that she was working in
the back room.

 Expected to find only two girls inside store, and there were two other girls
up front in the dining room area sitting down. I could see the commotion going on
up front. I checked the door, and it was locked. There was one key in the lock.
The door was locked. I looked outside to make sure no one was looking in.

 As this went along, I got more and more scared. I looked out to check the
front again. I heard the girls crying and one of the girls say that that's all there is.
It's been dropped and you can't get to it. I went back there. I saw that all four girls
were naked. I went to the pile of clothes and picked up some clothes to use to tie
them up.

 I remember a T-shirt and a bra used to tie them up. The girls were crying
and whimpering. They were begging not to kill them. They said that they didn't
want to die. I got a paper towel and put it inside one of the girl's mouth. [Sic.] I
remember that my finger pushed through the towel when I was trying to stuff it in
her mouth. This may not have worked, so I might have had to use something else
to stuff in her mouth. It was like terry cloth.

 The girls were on their knees. I don't believe they were standing up,
because I was looking down at them. I went to the back and saw one of the
dark-haired girls on her hands and knees. I got on top of her. I tried to do her from
the front. I looked at her face. I didn't want to look at her face. She had a piece of
white terry cloth towel on her mouth. I looked away because I didn't want to see
her. I couldn't get it up because I knew that what I was doing was wrong. I sort of
faked it. The girl was sitting on the floor. I pointed the gun at her and tried to
shoot at first but couldn't. I pointed the gun again at the girl and fired once into
her head.

 I don't remember seeing a safe, but I don't remember what she was doing
down on the floor. I remember looking in the doorway, and the gun is still in my
hand. I saw the side profile of the girl. She had like a white shirt on. I think I shot
her in the head. I have been not wanting to remember this. I know I told you
something different, but I did her too. I dropped the revolver.

 I saw the girls laying [sic] there and I pulled one of the girls on top of the
other. I gathered up napkins, cups, paper towels, and piled them on top of the
three girls. I sprayed Zippo fluid on top of the girls. I emptied the can of lighter
fluid. I had a Zippo lighter with me and lit the fire. I heard a whoosh sound of the
accelerant when it caught fire. I don't remember what I did with the can. I could
have threw [sic] it in the pile of stuff in the back of the store.

 I remember that my only thought was to get out. I went outside. I had
taken a knife from inside the shop. I believe I got it off the counter. It was a nice
knife. I told you all before that I had taken a set of keys, but it was a knife. I
remember now that it was a knife.

 I remember driving but I don't remember what direction. I got out and
threw up over the railing of the bridge. I took the knife and I threw it over the rail
also. I made sure it was gone. I remember trees, and I don't remember seeing any
water. I got back into the car. I don't know what happened next. I remember being
back at the apartment.

 Detective Fuentes asked me to describe the two guns. A black .22-caliber
revolver, small; I think it had wood grips. A small, semiautomatic pistol; it had a
clip. I think it was a .38. Some of the writing on the gun was scratched off.

 On the weekend I rode to San Antonio. I got a hold of a newspaper and I
remember reading about the fire and the yogurt shop murders. I read it out loud. I
remember getting back home and wanting to do nothing more than sleep.

 The semiautomatic was lying on the bed. I knew that I had to get rid of it. I
picked it up and left the apartment. I remember walking past a dumpster and
thinking I should just throw it in the dumpster. I walked into the creek in the
apartment complex. I put it in a hole in the side of a wall in the creek. I wedged
another rock in it. I stacked some rocks near it as a marker to remind me where it
put it. [Sic.]

 In December of 1992 I was smoking a lot of pot. I had been drinking a lot
too and started having flashbacks. I went back out to the creek and found the gun.
I took the gun and put it in a brown paper back (sic) that I found in the creek. I
took the gun back to south Austin to our apartment. I told Pat that I needed to get
rid of what was in the sack. I didn't tell him. He told me that he put it out in the
trash.

 I can read, write and understand the English language in the above statement I have read, and it is true and correct to the best of my knowledge and belief.
Signed, Michael J. Scott.


 In determining the probable impact of this erroneously admitted statement on the minds
of an average jury, we also must consider the importance of the witness's testimony, whether the
testimony was cumulative, the presence or absence of corroboration, and the overall strength of
the State's case. (21)

 There was no physical or forensic evidence connecting the appellant to the crime. There
was no witness that could tie the appellant to the crime. The question of the appellant's guilt
hinged on whether the jury believed the appellant's videotaped confession, which the jurors saw
and heard.

 The appellant repudiated the confession. He testified that on the night of the murders, he
went to a movie and met Scott afterward. He said that he confessed because he gave up on
himself and thought that if he told the police what they wanted to hear, they still could not do
anything to him because he was not involved in the murders.

 In this case, a repudiation of a confession may have more than the usual weight. Police
investigators had obtained other confessions to these murders that included non-public information, and the investigators had decided the confessions were not true. Within days of the murders,
police were inundated with tips and leads. Many people knew facts that a witness called "the
kind of information that should have remained at the crime scene." The appellant introduced
several stories that the local newspaper published in December 1991 that contained "non-public"
facts about the crime. An investigator testified that within weeks of the murders, "too many
people [knew] too much about [the] crime scene." Many teenagers frequented the mall area near
the yogurt shop, and information that the police had withheld quickly spread among "kids talking
to each other about what they thought they knew about the case." Another investigator testified
that "perhaps as many as 60 teenagers in that first week or two after these murders were brought
in for questioning." He and another investigator testified that the investigation was derailed when
too many teenagers began providing too much confidential information. The investigators had to
investigate the leakage of information from their own investigation. Several investigators were
removed from the case, one after being investigated by the internal affairs division.

 In February and March 2002, Alex Briones and Shawn Pearson Smith confessed to the
murders. The appellant introduced these confessions, which contained non-public, "hold-back"
facts. Despite the confessions, police investigators decided that neither Briones or Smith had
committed the crime.

 The State argued that, despite the appellant's repudiation of his statement about shooting
Ayers, several details of his confession matched details Scott provided and therefore, Scott's
statement corroborated the appellant's confession. The introduction of Scott's edited statement
was therefore vital to the State's case; it was used to attack the veracity of the appellant's
recantation and to inferentially connect the appellant to the crime. The State reminded the jury of
the importance of Scott's statement in its closing argument when it referred to Scott's excerpts
and its corroborating details a number of times.

 Scott's statement also corroborated the State's explanation of the physical evidence.
Although it was undisputed that there had been a fire at the scene of the crime, it was not clear
whether an accelerant had been used to start the fire. Experts disagreed. The State's position in
this trial was that an accelerant had been used, and it was supported by Scott's statement.

 We cannot say, beyond a reasonable doubt, that the admission of Scott's statements did
not affect the jury's determination of the appellant's guilt. We sustain the appellant's first point
of error.

III. Other Issues


A. Admission of Co-defendant's Statement to Statham


 The appellant's third and fourth points of error are that the trial court erred in admitting
Amanda Statham's testimony that Scott admitted to her that he committed the offense. The
appellant complains, as he did in his first two points, that the evidence was hearsay and that it
violated his right to confront the witnesses against him.

 Statham testified that several days after the murders she was talking with Scott at her
house. She asked him why the police had questioned him about the murders, and he said, "I did
it." Scott also told her some details of the murders.

 Scott's statement was clearly a statement against his penal interest, which comes within
an exception to the hearsay rule. (22) In addition, it was a spontaneous statement made to a friend
during a casual conversation shortly after the commission of the crime, and it was said in a non-threatening, non-coercive atmosphere. Finally, Scott's later written statement, the appellant's
statement, and the physical evidence independently corroborate Scott's confession of guilt to
Statham.

 The appellant argues that, because Statham testified that she was drinking vodka when
Scott made his statement and that she did not believe him, the statement should not have been
admitted. Statham's drinking might affect a jury's view of her credibility, and her opinion of the
truth of Scott's statement (on the admissibility of which we express no opinion) might go a jury's
decision on that issue, but they would not mean that the trial court abused its discretion in
admitting the evidence.

 With regard to the appellant's claim that the admission of the statement violated the
Confrontation Clause, we conclude that the statement was nontestimonial under Crawford. In
explaining the meaning of "testimonial statement," the Court in Crawford said, "An accuser who
makes a formal statement to government officers bears testimony in a sense that a person who
makes a casual remark to an acquaintance does not." (23) Scott's statement to Statham was such a
remark. We hold that the admission of the statement did not violate the Confrontation Clause.
Points of error three and four are overruled.

B. Admission of Statham's Statement to Her Mother


 In his fifth and sixth points of error, the appellant asserts, "Because Stratham's testimony
was inadmissible, third-party rehabilitation testimony [from Statham's mother] is likewise
inadmissible." (24) Since we have overruled the appellant's points that Statham's testimony was
inadmissible, we shall not sustain this argument which depends on those points. Points of error
five and six are overruled.

C. Voluntariness of the Appellant's Statements 


 In his seventh and eighth points of error, the appellant complains that the trial court erred
in admitting his statements to the police in violation of the Due Process Clause of the United
States Constitution and the Due Course of Law provision of the Texas Constitution because his
statements were involuntary.

 On September 15, 1999, Austin Police Detective Robert Merrill and a local officer, who
were dressed in plain clothes, drove an unmarked police car to the appellant's residence in
Charleston, West Virginia. When the appellant answered the door, both officers identified
themselves. Merrill told the appellant that he was following up on the investigation of the yogurt-shop murders and that he would like to speak with the appellant about the murders. The appellant
agreed, called his wife, and voluntarily accompanied the officers to a local police station.

 Throughout the day, Merrill told the appellant more than once that he was not under
arrest and that he could return home at any time.

 At the station, the appellant waited in the lobby for a few minutes while Merrill checked
the interview room. Earlier in the day he had set up a video camera that was built into a wall
clock and put a small audio recorder in the drawer of a desk in the room. Merrill then showed the
appellant to the interview room and began the interview around 2:15 p.m.

 Around 7:00 or 7:30 p.m., Merrill and the appellant agreed to put the appellant's
statement in writing. Merrill then read the appellant the Miranda (25) warnings that were on a
statement form. The appellant terminated the interview, saying that he wanted to go home and
talk to his wife about everything before continuing. Merrill asked him if he also was invoking his
right to an attorney, and the appellant said that he was. Merrill immediately stopped the interview, and officers took the appellant home.

 Merrill testified that, although the subject of a lawyer came up several times during the
interview, the appellant did not invoke his right to an attorney until the very end, of the interview
at which time Merrill immediately terminated the interview. Merrill also informed the appellant
several times throughout the interview that he was not under arrest and that he was going home
after the interview. Indeed, weeks passed between the interview and the appellant's arrest.

 Because the appellant has not argued that the Texas Constitution should be interpreted
differently from its federal counterpart, we shall treat them as providing the same protection and
address the points together. (26)

 The Due Process Clause of the Fourteenth Amendment requires that a confession must
have been voluntarily made to be admissible. (27) Coercive police activity is a necessary predicate
to the finding that a confession is not "voluntary." (28) In other words, a court must examine
whether the defendant's will was overborne by the circumstances surrounding the giving of the
confession; the court must take into consideration the totality of all the surrounding circumstances, including both the characteristics of the accused and the details of the interrogation; the
determination requires a weighing of the circumstances of pressure against the power of
resistance of the person confessing. (29) The Fifth Amendment requirements of Miranda apply only
if the statement at issue was the result of the interrogation of a suspect who was in custody at the
time. (30)

 The appellant argues that his police-initiated statement was not voluntary because (1) he
was interrogated for several hours, (2) his attorney was not allowed access to him, (3) he was a
high school dropout with a learning disability, (4) he was not advised of his Miranda rights, (5)
he was interviewed in a police interrogation room with a hidden video camera, and (6) the police
lied to him by suggesting that they had evidence that, in fact, did not exist.

 The appellant was approached at his home by the police. At their request, he voluntarily
accompanied them to the police station to discuss the murders. The uncontroverted evidence
shows that the authorities never arrested the appellant or otherwise held him in custody during
the time that he was at the station. In fact, the evidence shows that he could have left the building
at any time. Because the appellant was never in custody, the police were not required to read him
his Miranda rights. Further, no evidence was presented indicating that the police somehow tried
to exploit the appellant's alleged learning disability to gain the statement. (31)

 Although the interview was long, the appellant indicated that he had participated in
lengthy sessions before, and the evidence showed that he was told on a number of occasions that
he was not under arrest and that he could leave at any time. That his attorney was not allowed to
see the appellant is also of no consequence in this determination. The appellant's father-in-law
testified that he hired an attorney to represent the appellant after the appellant had accompanied
the police to the station and had been talking to them for some time. Even if the protections of
Miranda are triggered, the police have no duty under the Fifth Amendment to inform a suspect of
an attorney's efforts to reach him. (32) The Sixth Amendment right to counsel had not attached
because the appellant had not been charged. (33)

 Finally, the appellant implies that the use of hidden recording devices and false information about the evidence against him amounted to police coercion and undermined the voluntariness of the statement. Deception is only one factor to be considered in applying the general
"totality of the circumstances" test. (34) Deception concerning what incriminating evidence
authorities may have is not the type or character of coercion that would overbear the will of the
defendant and bring about a confession not freely determined. (35) Finally, the appellant cites no
law requiring officers to inform a suspect that their conversation with him is being recorded.

 Given these circumstances, the appellant has failed to show that his statement was the
product of any police coercion or that it was involuntary. Points of error seven and eight are
overruled.

D. Admission of Other Testimony


 In his ninth point of error, the appellant complains that the trial court erred in allowing
James Ramsbottom to testify that he had seen the appellant in possession of a gun four to five
years before the murders. He contends that this testimony was irrelevant, more prejudicial than
probative, and amounted to improper extraneous-offense or character evidence.

 During a hearing outside the presence of the jury, the appellant objected several times that
Ramsbottom's testimony was about an act that was too remote to be relevant. The appellant also
argued, "Any probative value [the testimony] might have is clearly outweighed by the prejudicial
impact" of the evidence. In response, the State argued that the testimony was highly relevant and
probative because it placed the appellant in possession of a "silver .380." The State noted that the
ballistics evidence showed that Amy was killed with a .380-caliber weapon, and the appellant in
his own confession stated that he used a "silver .380" in the commission of the instant offense.
The appellant then briefly commented that he thought the testimony tended "to go more as a
character trait," and the parties continued to argue the relevance of the evidence.

 Outside the jury's presence, Ramsbottom testified that he knew the appellant in junior
high school in West Virginia in 1986 and 1987. Ramsbottom told the court that on numerous
occasions he saw the appellant in possession of a chrome- or nickel-plated .380 semiautomatic
handgun with black grips. He also testified that the weapon was taken away from the appellant by
another student during an altercation. After a review of a "substantial portion of the testimony in
the case" and relevant case law, the judge ruled that the testimony would be allowed, without any
reference to the place or the circumstances in which the witness saw the appellant with the gun,
or to any other weapons that he may have seen. The judge noted that such details were more
relevant to the immaterial fact of character than to the material fact that the appellant was seen in
possession of a particularly described weapon that he was claiming never to have possessed. The
judge further cautioned the State that its closing argument should be restricted likewise.

 In his argument on appeal, the appellant again asserts that the testimony involves
information that is too remote to be relevant, and that any probative value it may have was
outweighed by the danger of unfair prejudice.

 Under Rule of Evidence 401, evidence is relevant if it makes the existence of a fact that is
of consequence to the determination of the action more probable than it would be without the
evidence. Rule 402 makes all relevant evidence admissible unless a law provides otherwise.
However, even when relevant, evidence may still be excluded by the trial court. One such law is
Rule 403, which authorizes exclusion of relevant evidence if its probative value is substantially
outweighed by the danger of unfair prejudice (among other things). The admissibility of evidence
is within the discretion of the trial court, and the court's decision will not be overturned if it was
not an abuse of discretion. In other words, as long as the trial court's ruling was within the zone
of reasonable disagreement, the appellate court should affirm. (36)

 The State argued that the testimony at issue was relevant evidence of the appellant's
possession of a weapon that was like the one that killed the victim, and that he confessed to using
in killing the victim (although he recanted the confession). The judge could have concluded
reasonably that the danger of unfair prejudice from the limited testimony about the gun did not
substantially outweigh the probative value.

 With regard to Rule 404, even assuming that defense counsel's mention of "character" at
trial preserved this issue for review, the appellant's argument on appeal does no more than cite
the language of the rule. Because he has failed to apply the extraneous-offense and character-propensity law to the facts in this case, he has failed to brief this portion of his point adequately,
and we shall not address it. (37)

 The court did not abuse its discretion in allowing the testimony. Point of error nine is
overruled.

 The appellant complains in his tenth and eleventh points of error that the trial court erred
in allowing the testimony of psychologist Dr. Jeffrey Harlow about his therapy sessions with the
appellant. He contends that this testimony was irrelevant and prejudicial and violated his
"confidential communications privilege." The appellant again cites Rules of Evidence 401, 402,
403, and 404. However, his argument on the application of Rules 401 through 403 consists of the
conclusory statements, "This testimony is irrelevant, and any probative value is grossly outweighed by its prejudicial nature," and, "For the sake of brevity, appellant refers this Court to his
arguments and authorities in Point of Error IX, supra." The appellant makes no argument or
other reference to Rule 404. Because the appellant has failed to apply the law to the facts
involved in these points of error, he has failed to adequately brief these aspects of his points, and
we shall not address them.

 The appellant'seleventh point of error is that Harlow's testimony violated his "confidential communications privilege." He recognizes that no such privilege exists in Texas for criminal
proceedings. Nevertheless he contends that, because the communications occurred in West
Virginia, the law of that state should govern. 

 In Gonzalez v. State, 45 S.W.3d 101, 103 (Tex. Cr. App. 2001), this Court recognized the
general rule that when there is a conflict of laws concerning the admissibility of evidence, the
law of the forum applies. There are three exceptions to this rule: privileged communications,
parol evidence, and the statute of frauds. In the case of privileged communications, admissibility
depends upon which state had the "most significant relationship" with the communication. The
state where the communication took place is generally the state with the most significant
relationship. (38)

 Assuming that West Virginia law has the most significant relationship with the communication, the appellant still cannot prevail. When asked whether such a privilege existed in criminal
trials in West Virginia, Harlow responded that no privilege existed if there was a court order
signed by a judge. Harlow's understanding of the law corresponds with West Virginia Code
Section 27-3-1, which states in pertinent part:

 Definition of confidential information; disclosure


 (a) Communications and information obtained in the course of treatment or
evaluation of any client or patient shall be deemed to be "confidential information" and shall include the fact that a person is or has been a client or patient,
information transmitted by a patient or client or family thereof for purposes
relating to diagnosis or treatment, information transmitted by persons participating
in the accomplishment of the objectives of diagnosis or treatment, all diagnoses or
opinions formed regarding a client's or patient's physical, mental or emotional
condition; any advice, instructions or prescriptions issued in the course of diagnosis or treatment, and any record or characterization of the matters hereinbefore
described. It does not include information which does not identify a client or
patient, information from which a person acquainted with a client or patient would
not recognize such client or patient, and uncoded information from which there is
no possible means to identify a client or patient.

 

 (b) Confidential information may be disclosed: 

* * *


 (3) Pursuant to an order of any court based upon a finding that said information is
sufficiently relevant to a proceeding before the court to outweigh the importance
of maintaining the confidentiality established by this section[.]


The trial judge found that the information sought in the trial was sufficiently relevant to the
proceeding to outweigh maintaining the confidentiality of the communications about which the
doctor would be questioned. The court then ordered Harlow to answer the parties' questions.
Thus, the court complied with West Virginia law and did not err in admitting Harlow's testimony. Points of error ten and eleven are overruled.

 The appellant complains in point of error twelve that the trial court erred in admitting the
testimony of David Cancelada, M.D., who he claims testified beyond his realm of expertise.
Specifically, the appellant complains that Cancelada was allowed to testify that photographs of
the crime scene suggested direct-flame contact on the bodies.

 Rule of Evidence 702 reads:

 If scientific, technical, or other specialized knowledge will assist the trier of fact
to understand the evidence or to determine a fact in issue, a witness qualified as an
expert by knowledge, skill, experience, training, or education, may testify thereto
in the form of an opinion or otherwise.


Under Rule 702, the trial court, before admitting expert testimony, must be satisfied that three
conditions are met: (1) that the witness qualifies as an expert by reason of his knowledge, skill,
experience, training, or education, (2) that the subject matter of the testimony is an appropriate
one for expert testimony, and (3) that admitting the expert testimony will actually assist the
factfinder in deciding the case. (39) We review a trial court's decision to admit or exclude expert
testimony under an abuse-of-discretion standard. A ruling that is within the zone of reasonable
disagreement will be upheld. (40)

 Outside the jury's presence, the appellant objected that Cancelada was not qualified to
offer opinions about whether the burns the victims received were contact or radiation burns. The
State established that Cancelada was a general surgeon who had specialized in burns for the last
three years. Cancelada testified that he was familiar with the various types of burns and their
degrees. He also testified that he had seen over 700 burn patients in his specialized clinical
experience. The court ruled that Cancelada was qualified, based on the information Cancelada
had received in the case and his training and experience, to testify that the burns depicted in the
photographs were consistent with burns that he had seen in his experience that were caused by
direct flame, but that he could not testify that the burns depicted in the photographs definitely
were one kind of burn or another. Thus, the judge sustained the appellant's objection in part and
overruled it in part.

 The trial court was within its discretion in admitting the limited portion of Cancelada's
testimony, reasonably finding by a preponderance of the evidence that: (1) Cancelada, because of
his training and experience, qualified as an expert on burn injuries, (2) burn injuries and any
attendant damage is an appropriate area for expert testimony because lay persons are typically not
versed in the area, and (3) Cancelada's specialized knowledge would assist the jury in appellant's
case. The appellant's point of error twelve is overruled.

E. Constitutionality of Code of Criminal Procedure Article 37.071 In his fourteenth and fifteenth points of error, the appellant asserts that Article 37.071 is
unconstitutional as applied to him because it allows for the execution of a juvenile offender in
violation of the Eighth Amendment to the United States Constitution and international law.

 The appellant has failed to preserve these issues for our review because he did not raise 
them at trial. Therefore we may not consider them on appeal. (41) We have no doubt that on remand
the district court will act in accordance with the decision that the Supreme Court made, after the
trial of this case: "The Eighth and Fourteenth Amendments forbid the imposition of the death
penalty on offenders who were under the age of 18 when their crimes were committed." (42)

IV.


Conclusion


 The judgment of the District Court is reversed, and the case is remanded to that court.


Delivered May 24, 2006.

Do Not Publish.
1. See Code Crim. Proc. art. 37.071, § 2(h).
2. Brief, at 77.
3. Greene v. Massey, 437 U.S. 19, 24 (1977).
4. Rains v. State, 604 S.W.2d 118, 120 (Tex. Cr. App. 1980).
5. Griffin v. State, 614 S.W.2d 155, 159 (Tex. Cr. App. 1981) (conforming this court's minimum standard to
the minimum standard of due process).
6. See Jones v. State, 944 S.W.2d 642, 647-48 (Tex. Cr. App. 1996) (The factual sufficiency review process
begins with the assumption that the evidence is legally sufficient. The court views, without the prism of "in the light
most favorable to the prosecution," all of the evidence in the record related to appellants sufficiency challenge, not
just the evidence which supports the verdict. The court reviews the evidence weighed by the jury which tends to
prove the existence of the elemental fact in dispute, and compares it to the evidence which tends to disprove that fact.
It sets aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust).
7. See Vodochodsky v. State, 158 S.W.3d 502 (Tex. Cr. App. 2005).
8. R. Evid. 801(d).
9. R. Evid. 803.
10. R. Evid. 803(24).
11. Ohio v. Roberts, 448 U.S. 56, 63 (1980); Guidry v. State, 9 S.W.3d 133, 149 (Tex. Cr. App. 1999).
12. See Pointer v. Texas, 380 U.S. 400 (1967).
13. Roberts, supra note 11, at 66 (quotation marks omitted).
14. Ibid.
15. Crawford v. Washington, 541 U.S. 36, 50-52 (2004) (citations omitted).
16. See id., at 65-69.
17. Id., at 52.
18. R. App. P. 44.2(a) (adopting the standard of Chapman v. California, 386 U.S. 18 (1967)).
19. Lilly v. Virginia, 527 U.S. 116, 140 (1999); Delaware v. Van Arsdall, 475 U.S. 673, 686 (1986). 
20. Harrington v. California, 395 U.S. 250, 254 (1969) (applying the standard of Chapman).
21. Van Arsdall, supra note 19, 475 U.S., at 684. 
22. See R. Evid. 803(24).
23. 541 U.S., at 51.
24. Brief, at 59.
25. Miranda v. Arizona, 384 U.S. 436 (1966).
26. See Heitman v. State, 815 S.W.2d 681, 690-91 n.23 (Tex. Cr. App. 1991).
27. See Brown v. Mississippi, 297 U.S. 278 (1936) (reversing a criminal conviction under the Due Process
Clause because it was based on a confession obtained by physical coercion).
28. Colorado v. Connelly, 479 U.S. 157, 167 (1986).
29. Dickerson v. United States, 530 U.S. 428, 434 (2000).
30. See Miranda v. Arizona, 384 U.S. 436 (1966).
31. See Connelly, 479 U.S., at 164-65.
32. Moran v. Burbine, 475 U.S. 412, 425 (1986).
33. See id., at 430-31.
34. See Frazier v. Cupp, 394 U.S. 731 (1969).
35. Green v. State, 934 S.W.2d 92, 99-100 (Tex. Cr. App. 1996).
36. Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Cr. App. 1991).
37. See R. App. P. 38.1(h).
38. Id., at 106.
39. Alvarado v. State, 912 S.W.2d 199, 215-16 (Tex. Cr. App. 1995).
40. Sexton v. State, 93 S.W.3d 96, 99 (Tex. Cr. App. 2002).
41. See R. App. P. 33.1(a): ("As a prerequisite to presenting a complaint for appellate review, the record must
show that (1) the complaint was made to the trial court ").
42. Roper v. Simmons, 543 U.S. 551, 578 (2005).